UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


LARRY JOHNSON, Pro Se,

          Plaintiff,

      v.

LISA SIMONSON and KELLY PAINE,

          Defendants.

Case No. 3:23-cv-01561-YY

OPINION AND ORDER

YOU, Magistrate Judge.

      Plaintiff Larry Johnson, who is representing himself in this matter, has filed this lawsuit alleging several claims under the federal Fair Housing Act ("FHA") against defendants Lisa Simonson and Kelly Paine. Both plaintiff and defendants have moved for summary judgment. *See* ECF 51, 69. Because plaintiff has failed to produce evidence sufficient to sustain any of the claims asserted in his complaint, plaintiff's motion for summary judgment is denied and defendants' motion for summary judgment is granted.

I.    **Background**

Plaintiff is a resident of Uptown Tower Apartments, a HUD Section 8 property managed by Guardian Management ("Guardian").[1] Defendant Simonson is the on-site property manager of Uptown Tower,[2] and defendant Paine is the portfolio manager who has overseen operations at Uptown Tower since 2018.[3] According to Paine, "[r]esidents at Guardian-managed properties receiving HUD Section 8 assistance are required under the terms of their lease agreements and HUD regulations to complete and sign annual HUD assistance recertification documents to renew their HUD assistance to ensure that assisted tenants pay rents commensurate with their ability to pay."[4] Furthermore, "[p]roperty owners of HUD Section 8 properties are required to conduct a recertification at least annually, and owners must recompute the tenants' rents and assistance payments based on the information provided by the tenant."[5]

In 2018, a dispute arose between plaintiff and Guardian regarding whether plaintiff's wife, who was to move to the United States from the Philippines that year, could be considered a "live-in aide," whose income is excluded from HUD's calculation of a tenant's Section 8 housing subsidy.[6] Guardian had denied plaintiff's request for an "accommodation" on this issue based on its read of HUD regulations to exclude spouses from being "live-in aides" for the

---

[1] Simonson Decl. ¶¶ 2–3, ECF 71. Note that the undersigned's usual practice is to indicate the specific ECF number that corresponds to citations in the record. Here, however, the Simonson Declaration and all the exhibits attached to it were filed as part of the same document, ECF 71. Therefore, citations to the Simonson Declaration and any of its attendant exhibits will only be individually cited to ECF 71 where it would improve the clarity of reference for the reader.
[2] *Id.* at 2.
[3] Paine Decl. ¶ 2, ECF 72.
[4] *Id.*
[5] *Id.*
[6] Simonson Decl. ¶ 5, ECF 71; *see also See Johnson v. Guardian Mgmt.*, 535 F. Supp. 3d 1004, 1006 (D. Or. 2021) (describing dispute regarding spouses as live-in care givers).

purposes of subsidy calculation.[7] That dispute led to plaintiff filing several housing complaints and numerous other lawsuits in this district, which eventually sprawled to cover the "live-in aide" issue and a number of other issues, such as the availability of accessible parking, unit inspections, and more. *See, e.g.*, *Johnson v. Guardian Mgmt.*, No. 3:19-cv-00485-SI*; Johnson v. Brenneke*, No. 3:21-00582-JR; *Johnson v. Brenneke*, No. 3:21-cv-00685-JR; *Johnson v. Brenneke*, No. 3:21-cv-00871-JR; *Johnson v. Guardian Mgmt.*, No. 3:21-cv-00947-JR; *Hume v. Brenneke*, No. 3:21-cv-01439-JR.

While the lawsuits were pending, Guardian apparently consulted with HUD about plaintiff's recertification and "did not have [plaintiff] recertified for 2019 – 2021."[8] Although the declarations in the record do not state specifically the reasons for doing so, the decision to place the recertifications on hold while litigation was pending makes sense because the outcome of the lawsuit regarding the "spouse-as-live-in-caregiver" issue could have a direct and substantial impact on the amount of household income that plaintiff would be required to report for the recertifications. With the recertifications on hold, plaintiff paid approximately $255 per month in rent based on his income as calculated in 2019 during the pendency of his suits, and Guardian did not get paid the approximately $1,200 or more per month subsidy from HUD based on the apartment's market rate to offset plaintiff's reduced rent. Def. Mot. Summ. J. 3, ECF 69.

Once the lawsuits were resolved, Guardian, through Simonson, attempted to bring plaintiff's recertifications up to date in the summer of 2022. And from here, another set of issues arose and eventually led to this present suit, largely centered around plaintiff's refusal to sign most of the recertification paperwork for the past years unless Simonson or Guardian delivered

---

[7] *Johnson*, 535 F. Supp. 3d at 1006.
[8] Simonson Decl. ¶ 7, ECF 71.

the papers to his door.[9] Given the parties growing dispute about how and when the recertification paperwork would be signed, it is somewhat confusing that plaintiff's 2019 recertification paperwork is signed and dated July 26, 2022, and the record is unclear as to how or under what circumstances this came about.[10] In any event, Simonson wrote to plaintiff on August 4, 2022, that she wanted "to meet [plaintiff] tomorrow on [sic] the 7th floor community room to sign the last of the documents," meaning the 2020, 2021, and 2022 recertifications.[11]

Plaintiff was not available at that time and requested that Simonson "leave the documents at [his] door which will provide [him] the opportunity to read and review and consult with an attorney."[12] Plaintiff also wrote that there was "a pending reasonable accom[m]odation that the recertification is only for this year 2022," though the email does not contain any further explanation about this "accommodation" request.[13] According to Simonson, she believed she "could not place [the recertification] documents on [plaintiff's] door" because the "documents contained personal information[.]"[14] So she "sent the documents to [plaintiff] via regular mail," but he "continued to refuse to sign and return the certification documents."[15]

Plaintiff emailed Simonson again on August 6, 2022, this time accusing her of "delaying [his] April HUD 2022 subsidy recertification" and disputing that Guardian had the right to submit recertifications for past years.[16] Plaintiff wrote that Guardian had previously "notified [him] that the HUD annual re-certification would be suspended until resolution of the pending

---

[9] *See id.* ¶ 9
[10] Simonson Decl., Ex. C at 1.
[11] Simonson Decl., Ex. D at 5.
[12] *Id.*
[13] *Id.*
[14] Simonson Decl. ¶ 9.
[15] *Id.*
[16] Simonson Decl., Ex. D at 5.

federal spousal live in caregiver case," and claimed "[t]his non- mutual decision to delay the required annual HUD recertification . . . was in violation of HUD law under the Fair Housing Act."[17] Plaintiff noted that his "portion of the monthly subsidy payment of $255.00 was duly noted as 'payment in full' on each check submitted and cashed by Uptown Tower since 2019," which led plaintiff to unilaterally declare that he "had no rental agreement with Uptown and began a month to month rental tenancy at $255.00 monthly with tacit consent by management."[18] Plaintiff then claimed that he had "requested annual recertifications but was ignored by management until the federal spousal live in care giver case was resolved in my favor three and half years later" and accused Simonson and Guardian of engaging in a "criminal conspiracy to collect the past housing subsidy re[-] certifications that [Simonson or Guardian] failed to prepare" in an attempt to "defraud HUD."[19]

A few days later, plaintiff wrote that Simonson and Paine had not sent a "response to [his] reasonable accommodation for Guardian's fraudulent scheme to collect past HUD subsidy payments for 2019-2021 when I had no rental agreement and was on a month to month tenancy at $255 [per] month[.]"[20] Paine wrote back, "I am not clear on what you are asking for as a reasonable accommodation request. Enclosed is the form for you to complete so we can determine what you are requesting and the verification for us to review the request."[21] Regarding the recertification paperwork, Paine also wrote:

> Our office has contacted you to obtain your signatures in your final certification documents for getting your household reinstated with the HUD program at Uptown Tower. Please be aware that your certification was put on hold for the outcome of the pending court

---

[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.* at 1.
[21] *Id.* at 1.

> case, we did not suspend your certification; this was done at your request while the outcome of the case was determined. We are unable to leave this at your door, if you are unable to come to the office as requested to sign please let us know right away.
>
> If we are not able to get your household certified, and you to sign off on your final certification(s) your certification will terminate with Uptown Tower. If termination occurs due to resident failure to certify the rent will go to market rental rates and the household will no longer get subsidy.[22]

A stalemate apparently ensued, and plaintiff had still not signed the recertifications as of September 6, 2022.[23] On that day, defendants issued a Notice of For-Cause Termination, which stated as follows:

> On 08/04/2022 we gave you notice that your reclassifications for May 2020, May 2021 and May 2022 were ready to be signed in order to remain in compliance. Since August 4, 2022 you have delayed meeting to sign the paperwork in person. On August 10, 2022 you were sent an email from Kelly Paine asking that you come to the office to sign your recertifications. Failing to sign your recertifications would result in the termination of your HUD assistance and rent would go to market rate. On 09/806/2022 a rent check was submitted that is not at market rate of $1605.[24]

The form also stated that the "violations" could be cured by "sign[ing] all required recertifications for May 2020, May 2021 and May 2022. Pay the balance due for rent for September 2022 of $1045.00."[25]

Upon receiving the notice, plaintiff contacted Oregon Housing and Community Services ("OHCS"). An OHCS employee reached out to Paine and told her that plaintiff had called OHCS and reported: "[M]anagement was trying to do 3 years of certifications and have him sign each certification. He told [Gaurdian] he will not sign the past 2 years, 2020 and 2021, certifications

---

[22] *Id.*
[23] Simonson Decl. ¶ 11; *see also* Pl. Mot. Summ. J. 8, ECF 51.
[24] Simonson Decl., Ex. E at 1, ECF 71 (some punctuation omitted).
[25] *Id.* at 2 (some punctuation omitted).

but will sign the 2022 certification. He has asked to have it placed on his door, as he has poor

health and does not want to go to the office and risk getting sick, but management will not place

it on his door."[26] Paine wrote back that

> This is partially accurate; the resident was involved in legal case
> and his certification was put on hold with the courts for this matter
> to be resolved. This has now been resolved and we are trying to
> process the certifications for the resident so that he can be put back
> into the program. I have previously talked to HUD about this
> matter and the process as well. I am happy to have the resident
> only sign current certification for 2022 period; this would mean
> that he would owe several thousands of dollars in unpaid rent if
> that is what is asking to do. He only paid his portion during this
> protected period, and we did not get the hap [sic] portion because
> we don't have his certification in the system completed. The
> resident has been served with For Cause to complete these past due
> certifications and sign. We have not left copies of the certification
> at his door because of personal information, the manager mailed
> these out to him when he requested [] we leave [it] at [the] door.[27]

The OHCS employee apparently left a voicemail for plaintiff that "he did need to sign the

recertifications and if he did not he would be liable for the past contract rent on the unit until he

recertifies," and then OHCS closed the complaint.[28]

Plaintiff still refused to sign the recertifications, and a state court eviction action was

scheduled for a trial date in November, and then reset to December of 2022.[29] Plaintiff obtained

counsel, signed the recertification paperwork, and the eviction action was settled by the parties'

stipulation to dismissal with prejudice on December 28, 2022.[30]

---

[26] *Id.*, Ex. F at 3.

[27] *Id.*

[28] *Id.* at 1.

[29] Simonson Decl. ¶ 13.

[30] *See* Simonson Decl., Ex. G at 2–24 (plaintiff's 2020–2022 recertifications signed and dated
Dec. 12, 2022); *see also* Simonson Decl., Ex. H at 1–2 (general judgment of dismissal reflecting
an attorney appeared and signed on plaintiff's behalf).

Approximately a month later, plaintiff's 2023 recertification paperwork caused another disagreement. Guardian sent plaintiff a form letter dated January 1, 2023, outlining the process for the annual "Regularly Scheduled Recertification," and setting a recertification meeting between plaintiff and the "Resident Manager" on January 11, 2023.[31] Plaintiff sent an email on January 6, 2023, outlining some of the information he thought was relevant to the recertification process, including that he "wish[ed] to add [his] 3 year old daughter . . . as a tentative new household member with an undetermined move in date," and characterizing Guardian's written recertification notice as "legal fukery."[32] Plaintiff did not appear for the January 11, 2023 meeting. Guardian sent two follow-up notices in February and March attempting to reschedule the meeting, but it does not appear that plaintiff ever responded to them.[33] Each of the three meeting notices warned that, under the terms of the lease, if plaintiff did not respond to the recertifications notices **before** May 1, 2023, Guardian had "the right to **terminate [plaintiff's] assistance** and charge . . . full contract rent, which is $1,639, **effective** 05/01/2023 **with no additional notice**."[34] On June 6, 2023, Guardian sent plaintiff a "Termination of Assistance Notice" stating that plaintiff had failed to respond to the recertification notices and that plaintiff's "HUD Section 8 Assistance will be terminated effective 06/30/2023" and he would "be required to pay the full market rent in the amount of $1,639."[35]

Another stalemate apparently ensued, and Guardian initiated eviction proceedings against plaintiff based on his failure to pay the market rate rent in September of 2023.[36] Plaintiff then

---

[31] Simonson Decl., Ex. J at 2.
[32] *Id.* at 1.
[33] *See id.* at 3–4.
[34] *Id.* at 4 (emphasis in original).
[35] *Id.* at 5.
[36] Simonson Decl. ¶ 19.

received $10,000 in "emergency rental assistance, which brought his account current."[37] The parties settled the eviction action and it was dismissed.[38] According to Simonson, Guardian dismissed the eviction action because plaintiff brought his account current and agreed to sign his annual recertification paperwork for the remainder of 2023.[39]

Plaintiff appears to have completed some portion of the 2023 recertification paperwork and signed it on September 28, 2023.[40] On October 4, 2023, Uptown Tower's Assistant Community Manager returned a packet of documents to plaintiff with a letter indicating there was missing information and "some corrections to be made" on the pages that plaintiff had submitted.[41] The documents contain numerous handwritten "post-it" type notes with instructions for plaintiff, including that plaintiff needed to indicate the "last year [he] worked . . . and what [he was] doing," and attempting to explain the difference between "disability compensation" as part of an employment benefit and plaintiff's Social Security disability income, among many other notes.[42] Simonson also prepared a document entitled "Detailed Directions for Larry Johnson" that attempted to go form-by-form and at times page-by-page and provide instructions on the portions of the forms that plaintiff needed to correct, expand, or clarify.[43] According to a post-it note that appears to have been attached to this "Detailed Directions" document, these instructions were "posted to door 10/20/23."[44] One of the instructions directed plaintiff: "Please remove daughter, daughter does not currently reside in the home, a dependent cannot be added it

---

[37] *Id.*

[38] *Id.*; *see* Simonson Decl., Ex. K at 1 (notice of dismissal).

[39] *Id.* ¶ 19.

[40] Simonson Decl., Ex. I at 1.

[41] *Id.* at 9.

[42] Simonson Decl., Ex. I at 10, 11.

[43] *Id.* at 20–22.

[44] *Id.* at 20; *see also* Simonson Decl. ¶ 20 (stating that she "prepared an updated annual recertification paperwork . . . and posted it to [plaintiff's] door on October 20, 2023").

they might move in. If the dependent moves in then the process of qualifying the dependent will begin."[45] According to Simonson, plaintiff refused to sign the tenant income certification because there was some discrepancy regarding a bank account number, although it was the same bank account listed on prior recertifications.[46] Simonson attests that, to date, plaintiff has not signed the 2023 recertification as required under the terms of his lease and HUD regulatory requirements, and she has been unable to resubmit the recertification to HUD.[47]

Plaintiff states that he "never refused to complete and sign [his] 2023 HUD re-certification paperwork" but instead "insisted that errors be corrected for itemized deductions."[48] One area of disagreement regarding the 2023 recertifications is plaintiff's belief that Simonson wrongly concluded that plaintiff could not deduct child care expenses for his daughter, who plaintiff said might move in at some "undetermined" date. *E.g.* Pl. 7th Resp. 3, ECF 123.[49] At other times, though, plaintiff states that he "did not refuse to complete and sign my 2023 HUD rectification paperwork. . . but requested by reasonable accommodation due to health problems that the paperwork be brought to my door as it had been done in the past." Pl. 2nd Resp. 3, ECF 111.[50]

In any event, plaintiff filed this suit on October 25, 2023, alleging among other things that Simonson and Paine were retaliating against him for his involvement in previous lawsuits. *See* Compl. ¶¶ 7–8, ECF 1. The complaint asserts the following claims for relief:

- Claim 1: "Retaliation"

---

[45] Simonson Decl., Ex. I at 18.
[46] Simonson Decl. ¶ 20.
[47] *Id.*
[48] Johnson Decl. at 2, ECF 91.
[49] *See also* Simonson Decl., Ex. J at 1, ECF 71.
[50] *See also* Johnson Decl. at 3, ECF 113 ("All defendants have to do to resolve the majority of this litigation as a reasonable accommodation is to bring the remaining recertification documents to my door for my signature and submit to HUD for payment."

- Claim 2: "Retaliation"
- Claim 3: "Interference with Housing Rights and Constitutional First Amendment Rights"
- Claim 4: "Restoration of Onsite Management Services"
- Claim 5: "Wheel Chair Accessible Parking Space with Signage"
- Claim 6: "Retaliatory Pre REAC and REAC Inspections"
- Claim 7: "Retaliatory refusal to process Johnson's 2023 application for child care expenses and dependent deduction while conducting a retaliatory eviction proceeding and a retaliatory termination of his HUD subsidy assistance."
- Claim 8: "Violations of Rights Involving the Uptown Renters Rights Association"
- Claim 9: "For Expansion"

Am. Compl. ¶¶ 1–75 (some capitalization modified). Plaintiff filed a "Motion for Partial Summary Judgment Against Defendant [Simonson] for All Retaliation Claims In Amended Complaint." ECF 51. Defendants subsequently filed a motion for summary judgment on all of plaintiff's claims. ECF 69. Plaintiff then filed seven separate documents as distinct "responses" to defendant's motion, *see* ECF 111–114, 120–125, as well as a sur-response to defendant's reply, *see* ECF 134. The parties cross-motions for summary judgment are now ripe for resolution.

## II.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party does so, the nonmoving party must go beyond the pleadings and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (citing Fed. R. Civ. P. 56(e)).

The court "does not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999). "Reasonable doubts as to the existence of material factual issue are resolved against the moving parties and inferences are drawn in the light most favorable to the non-moving party." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

Where both parties move for summary judgment, the court must "evaluate each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006) (internal quotation marks omitted). "Either party may defeat summary judgment by showing that there is a genuine issue of material fact for trial." *Fields v. Emergency Servs. Consulting Int'l, Inc.*, 760 F. Supp. 3d 1175, 1178 (D. Or. 2024) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986).

## III.    Discussion

### A.    Claim 1: FHA Retaliation

Plaintiff's first claim alleges that Simonson and Paine engaged in "lease violations, retaliation, intimidation, threats and tortious interference of benefits with plaintiff . . . on account of his having exercised his First Amendment rights to petition his government and assert his fair housing rights and assisted others in doing so." Am. Compl. ¶ 7, ECF 37. This claim is construed as an FHA retaliation claim arising under 42 U.S.C. § 3617, which makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [§ 3604]."

To state a claim for retaliation under section 3617, a plaintiff must allege facts showing (1) the plaintiff was engaged in protected activity, (2) the plaintiff suffered an adverse action,

and (3) there was a causal link between the two. *Brown v. City of Tucson*, 336 F.3d 1181, 1192

(9th Cir. 2003); *see also Dean v. Jones*, No. 3:09-cv-01102-AC, 2010 WL 1873089, at *3 (D.

Or. Mar. 2, 2010), *report and recommendation adopted*, 2010 WL 1838962 (D. Or. Apr. 30,

2010) (citing *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001)).

　　Generally speaking, it appears that this claim is based on the parties' dispute over the

recertifications for 2019 through 2022 that were "on hold" during the pendency of plaintiff's first

series of cases, and the subsequent foreclosure action that Guardian instituted against plaintiff

that was, as described above, immediately dismissed once plaintiff signed the recertification

paperwork for 2020 through 2022. And as detailed above, the main disagreement between the

parties was plaintiff's insistence that he would not sign the documents unless they were posted to

his door, and Simonson's apparent refusal to do so "because the documents contained personal

information."[51]

　　The fact that the foreclosure action was settled and dismissed immediately after plaintiff

signed the recertification paperwork is fatal to plaintiff's FHA retaliation claim regarding the

recertification paperwork for 2019 through 2022. The evidence shows that the eviction

proceedings were caused by plaintiff's failure to sign the 2020–2022 recertification documents

because as soon as plaintiff signed those documents, the eviction proceedings were terminated.

Plaintiff has therefore failed to establish the causal link required to establish a prima facie case of

retaliation. *See Santos v. Cnty. of Humboldt*, No. 1:22-cv-07485-RMI, 2023 WL 6882748, at *6

(N.D. Cal. Oct. 18, 2023) (finding that no causal link was established because a "plethora of

---

[51] Simonson Decl. ¶ 9, ECF 71; *see also* Am. Compl. ¶ 32, ECF 37. Note that plaintiff's complaint is "verified" and therefore "may be used as an opposing affidavit under Rule 56" so long as it is "based on personal knowledge and set[s] forth specific facts admissible in evidence." *Martin v. Dewsnup*, No. 6:11-cv-06420-AC, 2015 WL 13730889, at *1 (D. Or. Dec. 30, 2015) (citing Fed. R. Civ. P. 56; *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995)).

other plausible explanations" could account for the "chain of events surrounding" the alleged retaliatory action). To the extent plaintiff's complaint could be read as alleging that defendants retaliated against him by insisting they would not place plaintiff's paperwork "on his door" because it contained "personal information" and instead sent the papers to plaintiff through the mail, no retaliation claim could be based on this conduct because, among other reasons, it is not an "adverse action" as that term is understood under the FHA. *See Walker*, 272 F.3d at 1128 (explaining that "[i]n the context of a § 3617 claim, that adverse action must be in the form of coercion, intimidation, threats, or interference") (simplified).

Even if plaintiff could establish a prima facie case for FHA retaliation, plaintiff has not identified any evidence suggesting that defendants' actions regarding the recertification paper work—which were based on legitimate, non-retaliatory reasons—were really a pretext to disguise some retaliatory motive. *See Hardy v. Broadway Ests. Mobile Home Park LLC*, No. 2:17-cv-03951-DGC, 2019 WL 5719210, at *4 (D. Ariz. Nov. 5, 2019) (granting summary judgment in favor of defendants because "the undisputed evidence shows that [the plaintiff] was evicted for non-payment of rent" and thus the plaintiff could not establish that the defendant's actions were a "pretext" disguising retaliatory intent).[52] Thus, plaintiff's claim for retaliation

---

[52] Plaintiff at times asserts that he did not consent to putting the recertifications on hold for 2019 through 2022. *E.g.*, Pl. Decl. ¶ 7, ECF 91. But plaintiff does not explain how this action relates to any alleged retaliation. It is not clear from the record that the pause in recertification caused plaintiff any harm; it was Guardian who carried the burden of the "pause" in plaintiff's recertifications, as Guardian was not able to obtain reimbursement from HUD for the subsidized portion of plaintiff's rent—approximately $1,200 or $1,300 per month, as the market rate changed—during this period. *See* Def. Mot. Summ. J. 3, ECF 69; *see also* Paine Decl., Ex. B at 5, ECF 72 (plaintiff's account ledger). Plaintiff continued to pay his portion of the rent at the rate established by the last completed recertification paperwork—approximately $255 per month. *Id.*

based on the September 2022 Notice for For-Cause Termination fails as a matter of law and defendants are entitled to summary judgment on this claim.[53]

## B.     Claim 2: FHA Retaliation

Plaintiff's second claim for retaliation is based on the dispute over his recertification paperwork for the year 2023. *See* Am. Compl. ¶¶ 39–52, ECF 37. As described above, plaintiff again repeatedly refused to sign the 2023 recertification paperwork, although his reasons for doing so, and his argument in support of this claim, is not consistent. At times, plaintiff insists that he refused the sign the 2023 paperwork unless defendants "left [the 2023 recertification paperwork] at [his] door." Pl. Mot. Summ. J. 10, ECF 51. Not only does this fail to establish a prima facie claim for FHA retaliation for reasons already stated regarding plaintiff's 2019–2022 paperwork, but the evidence shows that defendants actually did what plaintiff demanded and posted the 2023 recertification paperwork and detailed instructions for completing it on plaintiff's door.[54] And still, plaintiff refused to sign. There is no evidence establishing a causal link between plaintiff's protected activity and defendants' alleged retaliatory actions, nor is there any evidence that defendant's actions were a pretext to disguise retaliatory intent. Like the 2019

---

[53] Arguably, plaintiff's complaint might be broadly read as asserting a failure to accommodate claim under the FHA. *See Johnson*, 535 F. Supp. 3d at 1010 ("The FHA makes it unlawful '[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of service or facilities in connection with such dwelling because of a handicap.' ") (quoting 42 U.S.C. § 3604(f)(2)). Plaintiff, though, specifically requested that his complaint "in it[s] entirety be constructed/construed as a retaliation complaint." Pl. Resp. 2, ECF 134. Given that request, and plaintiff's prior experience litigating an FHA failure to accommodate claim in this district, the court follows plaintiff's directive and analyzes his claims primarily as sounding in FHA retaliation. *See Johnson*, 535 F. Supp. 3d at 1010–16. Moreover, the fact that Simonson declined to post plaintiff's paperwork on his door and instead sent them to plaintiff through the mail means that plaintiff cannot satisfy the elements of a failure to accommodate claim under FHA; sending the paperwork to plaintiff through the mail was a reasonable accommodation. *See* Simonson Decl. ¶ 9, ECF 71.

[54] Simonson Decl., Ex. I at 20.

through 2022 recertifications, the evidence shows that Guardian brought the eviction action after plaintiff continually refused to sign the 2023 recertification paperwork despite Simonson's and Guardian's repeated attempts to assist plaintiff in completing it. There is no claim for FHA retaliation on these facts.

To the extent this claim is based on plaintiff's belief that defendants retaliated against him by "refus[ing] to process [plaintiff's] 2023 application for child care expenses and dependent deduction," the root of the problem is plaintiff's belief that defendants wrongly insisted that he could not deduct child care expenses for a dependent that "does not currently reside in the home[.]"[55] In January of 2023, plaintiff emailed defendants that he "wish[ed] to add [his] 3 year old daughter . . . as a tentative new household member with an undetermined move in date."[56] Defendants wrote back to plaintiff that his daughter could not be added to the form because she "[did] not currently reside in the home" and "a dependent cannot be added if they might move in."[57] Defendants noted that "if the dependent moves in then the process of qualifying the dependent will begin."[58]

These facts are not sufficient to establish a prima facie case for FHA retaliation. For one thing, plaintiff does not explain how the defendants' instructions regarding the child care deduction could constitute an adverse action; notably, the instructions specifically state that if plaintiff's daughter actually did move in, then the question regarding her qualification could be revisited. Plaintiff may disagree with defendants' interpretation of the HUD regulations, but

---

[55] *See* Simonson Decl., Ex. I at 18.
[56] Simonson Decl., Ex. J at 1.
[57] Simonson Decl., Ex. I at 18.
[58] *Id.* The relevant HUD regulations state that childcare expenses may only be deducted, in part, if "[t]he care is necessary to enable a family member to work, seek employment, or further his/her education." Paine Decl., Ex. A ("HUD Handbook 4350.3: Occupancy Requirements of Subsidzed Multifamily Housing Programs") at 3, ECF 72.

plaintiff does not cite to any evidence suggesting that defendants' reliance on or interpretation of the HUD guidelines for the childcare deduction was caused by any retaliatory motive, or was a mere pretext disguising retaliatory intent. Defendants are therefore entitled to summary judgment on plaintiff's second claim for relief.

C.      **Claim 3: Interference**

Plaintiff's third claim asserts that "Simonson and others . . . initiated retaliatory eviction proceedings against plaintiff . . . and interfered with his housing benefits and rights . . . and his [c]onstitutional First Amendment rights." Am. Comp. ¶ 55, ECF 37. This claim is largely duplicative of plaintiff's other retaliation claims, and fails as a matter of the law for the reasons previously explained. To the extent that this claim is asserting an action under 42 U.S.C. § 1983 for alleged violations of plaintiff's First Amendment rights, any such claim is subject to summary judgment because defendants here are not state actors and thus section 1983 does not apply. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999) ("To state a claim for relief in an action brought under § 1983, respondents must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law. . . . [T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful[.]") (simplified); *Smith v. Henry*, No. 3:22-cv-03093-LB, 2022 WL 3641124, at *4 (N.D. Cal. Aug. 23, 2022) ("To the extent the plaintiff implies that the defendants are acting under color of state law because they receive federal funding, numerous courts . . . have found that the receipt of HUD or other federal funds is insufficient to establish that landlords acted under color of state law in making housing decisions."). Defendants are therefore entitled to summary judgment on plaintiff's third claim for relief.

### D.      Claim 4: "Restoration of Onsite Management Services"

Plaintiff's fourth claim asserts that the "on site management services," apparently

including an office manager, assistance manager, two maintenance workers, and a services

coordinator, were "indiscriminately terminated in favor [of] a satellite management system . . .

without notice to [plaintiff] or approval by HUD." Am. Compl. ¶ 58, ECF 37. Plaintiff does not

explain how these allegations fit into any particular cause of action against defendants, or

provide any authority in support of such a claim. *See Slaughter v. Valley View I LLP*, No. 2:23-

cv-01360-LK, 2023 WL 6461058, at *2 (W.D. Wash. Oct. 4, 2023) ("Although a *pro se* litigant .

. . is entitled to leeway when the court construes her pleadings, it is not the court's duty to sort

through [the plaintiff's complaint and documents in order to piece together the basis of her

claim.") (citing *Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003)).

Thus, defendants are entitled to summary judgment on plaintiff's fourth claim for relief.

### E.      Claim 5: Accessible Parking Space

Plaintiff's fifth claim seems to assert that defendants have wrongly failed to provide him

a "wheel chair accessible parking space with signage." Am. Compl. ¶¶ 59–62, ECF 37. The

undisputed evidence shows that plaintiff was "given a parking space in a commercial parking lot

in the basement of Uptown Tower in resolution of prior HUD complaints arising from requests

for a parking space and other related litigation."[59] As part of that settlement agreement, plaintiff

agreed that the provided commercial space "will meet his accessibility needs without requiring

structural changes to the building or changes to the commercial parking area as it currently

exists."[60]  Plaintiff's claim for discrimination under the FHA necessarily fails because, among

---

[59] Simonson Decl. ¶ 22, ECF 71.
[60] Simonson Decl., Ex. L at 2.

other things, plaintiff cannot establish that the accommodation he now requests "may be necessary to afford plaintiff an equal opportunity to use and enjoy the dwelling," *Budnick v. Town of Carefree*, 518 F.3d 1109, 1119 (9th Cir. 2008) (simplified), because he previously agreed that the parking space in the commercial lot was satisfactory to meet his needs.

Moreover, plaintiff's parking space claim has already been adjudicated on the merits at least one other time. *See Johnson v. Brenneke*, No. 3:21-cv-00582-JR, 2022 WL 981295, at *8 (D. Or. Feb. 23, 2022), *report and recommendation adopted,* No. 3:21-cv-00582-JR, 2022 WL 980879 (D. Or. Mar. 31, 2022), *aff'd,* No. 23-35542, 2025 WL 521308 (9th Cir. Feb. 18, 2025) ("Plaintiff's parking space claim fails because Guardian Defendants never refused to make the requested accommodation. That is, Guardian Defendants provided plaintiff with a parking space mutually agreed upon as accessible to him. . . . [P]laintiff reached a settlement agreement with Guardian Defendants regarding his reasonable parking accommodation claim following the filing of a BOLI complaint. As part of that agreement, plaintiff would be assigned a parking space in Uptown Tower's commercial lot, free of charge; in exchange, plaintiff stipulated that 'the commercial space will meet his accessibility needs.' "); *see also Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001) ("Res judicata, also known as claim preclusion, bars litigation in a subsequent action of any claims that were raised or could have been raised in the prior action.") (simplified). Simonson represents that the residential parking garage at Uptown Tower currently "has limited availability and a waiting list for the single accessible parking space" and that the "commercial basement garage has only one assessible parking space, which is currently assigned to another Uptown Tower tenant with a disabled persons parking placard, who has occupied the parking space since April 2021."[61] There is simply no evidence in

---

[61] Simonson Decl. ¶ 21.

the record that defendants unlawfully discriminated against plaintiff with regard to his assigned parking spot. Defendants are therefore entitled to summary judgment on plaintiff's fifth claim for relief.

### F.     Claim 6: Retaliatory Inspections

Plaintiff's sixth claim for relief is based on "retaliatory pre-REAC and REAC inspections." Am. Compl. ¶¶ 64–68, ECF 37 (some capitalization modified). According to the complaint, HUD "conducts yearly physical inspections of all HUD financed housing thru HUD'S Real Estate Assessment Center (REAC) by the services of private inspection contractors. Uptown Tower in preparation for the official annual REAC inspections has instituted . . . 'pre REAC' inspections." Am. Compl. ¶ 65, ECF 37. Simonson generally corroborates these inspection requirements and procedures: "REAC inspections are conducted at Uptown Tower periodically by HUD, and are required every 1 to 3 years to ensure the property is kept in a safe and sanitary condition. Pre REAC inspections are conducted uniformly and in accordance with establish policy to ensure properties remain in compliance with applicable standards."[62]

The only allegation in the complaint regarding these inspections states that "[o]n October 18, 2023 the pre REAC Guardian team failed to gain entry into [plaintiff's] apartment[.]" Am. Compl. ¶ 67, ECF 37. According to Simonson, and not disputed by plaintiff, the "last property REAC inspection conducted at Uptown Tower was on May 22, 2024, and Mr. Johnson's unit was not chosen during this inspection," and in June of 2021, plaintiff's "unit was scheduled for a REAC inspection, but he refused entry for the inspection and another unit had to be chosen."[63] It appears, then, that no REAC or pre-REAC inspection has ever been conducted of plaintiff's unit,

---

[62] Simonson Decl. ¶ 23 (as written).
[63] *Id.*

and plaintiff cannot sustain a claim on any alleged "retaliation" based on an inspection that never

occurred because, among other things, there is no adverse action. Defendants are therefore

entitled summary judgment on plaintiff's sixth claim for relief.

### G.    Claim 7: Retaliatory Refusal to Process 2023 Recertification

Plaintiff's seventh claim for relief is based on defendants' allegedly "[r]etaliatory refusal

to process [plaintiff's] 2023 application for child care expenses and dependent deduction while

conducting a retaliatory eviction proceeding and a retaliatory termination of his HUD subsidy

assistance." Am. Compl. ¶¶ 69–71, ECF 37. This claim is duplicative of plaintiff's second claim

for relief and thus fails as a matter of law for the reasons explained above.

### H.    Claim 8: Violation of Rights Involving Uptown Renters Rights Association

Plaintiff's eighth claim for relief alleges that on October 19, 2023, a "management

employee" removed bulletin board postings from the Uptown Renters Rights Association and

that Johnson apparently no longer has access to a lockable bulletin board. Am. Compl. ¶ 73, ECF

37. Plaintiff then alleges that defendants are "using obstruction, intimidation, harassment,

frivolous litigation and coercion to interfere and disrupt by uninvited attendance in scheduled

tenant meetings in the 7th Floor conference room with [plaintiff] and the Uptown Renters

Association he founded." *Id.*; *see also* Pl. 8th Resp. 4–5, ECF 124.

None of these facts are sufficient to establish an FHA retaliation claim for numerous

reasons. The allegation that an unnamed "employee" removed any material from the bulletin

board or that plaintiff no longer has access to a locked bulletin board is not specific enough to

establish that either Simonson or Paine took any adverse action against plaintiff, or that there is a

causal link between any such action and some retaliatory intent by Simonson or Paine. Similarly,

plaintiff's vague allegation that Simonson or Paine attended an Uptown Renters Rights

Association meeting at some unspecified date is not sufficient to establish that either took an adverse action—which under the FHA encompasses actions that equate to "coercion, intimidation, threats, or interference," *Johnson v. Guardian Mgmt.*, No. 3:21-cv-1439-JR, 2022 WL 981324, at *4 (D. Or. Mar. 15, 2022), *report and recommendation adopted,* No. 3:21-cv-00947-JR, 2022 WL 980745 (D. Or. Mar. 31, 2022), or that any such action was retaliatory. Accordingly, defendants are entitled to summary judgment on plaintiff's eighth claim for relief.

I.    **Claim 9: "For Expansion"**

Plaintiff's ninth claim for relief appears to be a reservation of the right to assert additional causes of action, and does not assert any specific basis for recovery on any cognizable legal claim. Accordingly, defendants are entitled to summary judgment on this claim as well.

## ORDER

Plaintiff's Motion for Partial Summary Judgment (ECF 51) is denied and defendants' Motion for Summary Judgment (ECF 69) is granted. All other pending motions are denied as moot. This case is dismissed with prejudice and judgment shall be entered for defendants.

DATED September 29, 2025.

/s/ Youlee Yim You

Youlee Yim You
United States Magistrate Judge